## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Melissa Gillen, being duly sworn, depose and state that:

### Agent Background and Introduction

1.      I am employed as a Special Agent with the Drug Enforcement Administration ("DEA"), where I have worked since April 2018.  Since November 2018, I have been assigned to the New Bedford Resident Office of the New England Field Division of the DEA as a Special Agent. I am a graduate of the DEA Basic Agent Training Academy.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      Prior to joining the DEA, I was a Police Dispatcher/911 call taker in Montgomery County, Pennsylvania for approximately three years.  In that position, I worked directly with, and dispatched for, more than fifty police departments.  I was also responsible for answering 911 calls from the general public.  In 2014, I received a bachelor's degree in Business Administration with a minor in Criminal Justice from West Chester University in West Chester, Pennsylvania.  While in college, I completed two internships with the United States Postal Inspection Service in Philadelphia, Pennsylvania, where I worked in the narcotics and major crimes group assisting in various investigations regarding mailing of illegal narcotics.  During those internships, I also participated in multiple controlled deliveries, package interdictions, as well as search and arrest warrants.  In 2017, I received a Master of Business Administration from Pennsylvania State University.

4.      As a Special Agent with the DEA, I have participated in numerous drug investigations resulting in the criminal charges, arrests, seizures of narcotics, seizure of assets and

subsequent convictions for narcotic violations.  Through such training and experience, I have developed a working knowledge and understanding with the ways illicit drugs including heroin, fentanyl, cocaine, and other controlled substances, are packaged, priced, and distributed. Furthermore, I am familiar with the paraphernalia associated with certain drugs and the street terminology used in their classification.

5.      I have received training regarding narcotics investigations, drug identifications, confidential source handling, and surveillance techniques while attending the Basic Agent Training Academy.

6.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. During federal investigations, I have also reviewed recorded conversations and telephone, financial, and drug records.

7.      Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, heroin, fentanyl, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade.  I have received specialized training regarding the activities of narcotics traffickers, including the

methods used to package, store, and distribute narcotics, and the methods used by narcotics trafficers to conceal and launder the proceeds of their narcotics trafficking activities.

8.     Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.

9.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.  I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## Purpose of the Affidavit

10.     This affidavit is being submitted in support of an application for a search warrant for electronic equipment seized from Isaiah RIEVES a/k/a "Unk" ("RIEVES" or "Target Subject") pursuant to his arrest on October 23, 2019:

a. A Samsung Galaxy S10+ Model smartphone, model #SM-697SU, bearing IMEI: 354416100652502.

(the "Equipment"), that is in the possession of law enforcement officials as described in Attachment A. There is probable cause to believe that the Equipment contains evidence, fruits, and instrumentalities of the Target Offenses listed below, as described in Attachment B.

11.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

### *Drug Traffickers' Use of Cell Phones Generally*

12.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use cellphones to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

13.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. The Equipment is a smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and

receiving text messages, e-mails, and other electronic messages, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

14.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in smartphones.

15.     Based on my knowledge, training and experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

   a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

   b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person 'deletes' a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a 'swap' or 'recovery' file.

   c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

   d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or 'cache.'  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

*Criminal Use of Cell Phones by RIEVES*

16.     On October 23, 2019, the Honorable M. Page Kelley issued a criminal complaint against RIEVES, charging him with distribution of forty grams or more of fentanyl and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(V)(vi). The affidavit submitted in support of the complaint ("Complaint Affidavit")—and also in support of a search warrant for RIEVES' home—is attached hereto as Exhibit A, and incorporated by reference herein.

17.     RIEVES was arrested on the criminal complaint on October 23, 2019. At the time of his arrest, RIEVES had the Equipment on his person.

18.     On November 20, 2019, a grand jury sitting in Boston returned an indictment charging RIEVES with: distribution of 40 grams or more of fentanyl and other controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) (Count One); possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) (Count Two); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three); and felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count Four) (collectively, the "Target Offenses"). 19-cr-10445, Dkt. 14.

19.     As set forth in the Complaint Affidavit, RIEVES utilized at least two different telephones (RIEVES Phone and RIEVES Phone 2) to conduct his drug trafficking activities. *Complaint Affidavit* at ¶¶ 16-18, 21. Indeed, RIEVES not only changed his own telephone number during the course of this investigation, but he also he advised the cooperating source ("CS") to get a new telephone number as well. *Complaint Affidavit* at ¶18. Based on my training and experience,

I believe that RIEVES changed his number and/or used multiple telephones in order to thwart detection by law enforcement.

20.     The IMEI associated with the Equipment does not match the IMEI for either RIEVES Phone or RIEVES Phone 2.  The Equipment was the only telephone found on RIEVES at the time of his arrest, and investigators never located either RIEVES Phone or RIEVES Phone 2—even after conducting a search of RIEVES' residence.  Therefore, I believe the Equipment is a new or different telephone used by RIEVES in his ongoing effort to thwart detection by law enforcement, and that he discarded and/or destroyed RIEVES Phone and/or RIEVES Phone 2. The Equipment has been stored in a manner which prevented it from being erased or altered from an outside source.

21.     As such, I believe RIEVES uses the Equipment to facilitate his drug trafficking activities and that evidence, fruits, and instrumentalities of the Target Offenses will be located on the Equipment, as described in Attachment B.

## <u>CONCLUSION</u>

22.     Based on the information set forth above, I have probable cause to believe that

evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B, is

contained within the Equipment, as described in Attachment A.

I declare that the foregoing is true and correct.

_____

Melissa Gillen
Drug Enforcement Administration

Subscribed and sworn to before me on January ____8____, 2020



_____
Hon. M. Page Kelley
United States Magistrate Judge

### <u>ATTACHMENT A</u>

**Description of Equipment to Be Searched**

The equipment to be searched consists of the following: A Samsung Galaxy S10+ Model smartphone, model #SM-697SU, bearing IMEI: 354416100652502 (the "Equipment").   The Equipment is located at the Drug Enforcement Administration's New Bedford Resident Office.

## ATTACHMENT B
### Items to be Seized

I.    All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 21 U.S.C. §§ 841(a)(1), 18 U.S.C. § 924(c)(1)(A)(i) and/or 18 U.S.C. § 922(g) (the "Target Offenses") including those related to:

    1.    Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing the Target Offenses and/or referencing individuals engaged in the Target Offenses located in the Equipment, including but not limited to:

        a.    Names and contact information that have been programmed into the devices (including but not limited to contacts lists) of individuals who may be engaged in the Target Offenses;

        b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the Equipment;

        c.    Text messages both sent to and received by the Equipment (including any in draft form) relating to or referencing the Target Offenses and/or referencing individuals engaged in the Target Offenses;

        d.    Incoming and outgoing voice mail messages both to and from the Equipment relating to or referencing the Target Offenses or individuals engaged in the Target Offenses;

        e.    GPS data;

        f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the Equipment (including any in draft form)

relating to or referencing the Target Offenses or individuals engaged in the Target Offenses;

g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing the Target Offenses or individuals engaged in the Target Offenses;

h.      All data within the Equipment evidencing ownership, possession, custody, control, or use of the Equipment; and

i.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

### Definitions

For the purpose of this warrant:

A.      "Equipment" includes any hardware, software, storage media, and data.

B.      "Hardware" means any electronic device capable of data processing (such as a cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a drive intended for removable storage media); any related communication device (such as a SIM card), and any security device, (such as electronic data security hardware and physical locks and keys).

C.      "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately,

11

inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Special Agent Melissa Gillen, being duly sworn, depose and state that:

## Agent Background and Introduction

1.      I am employed as a Special Agent with the Drug Enforcement Administration ("DEA"), where I have worked since April 2018.  Since November 2018, I have been assigned to the New Bedford Resident Office of the New England Field Division of the DEA as a Special Agent. I am a graduate of the DEA Basic Agent Training Academy.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      Prior to joining the DEA, I was a Police Dispatcher/911 call taker in Montgomery County, Pennsylvania for approximately three years.  In that position, I worked directly with, and dispatched for, more than fifty police departments.  I was also responsible for answering 911 calls from the general public.  In 2014, I received a bachelor's degree in Business Administration with a minor in Criminal Justice from West Chester University in West Chester, Pennsylvania.  While in college, I completed two internships with the United States Postal Inspection Service in Philadelphia, Pennsylvania, where I worked in the narcotics and major crimes group assisting in various investigations regarding mailing of illegal narcotics.  During those internships, I also participated in multiple controlled deliveries, package interdictions, as well as search and arrest warrants.  In 2017, I received a Master of Business Administration from Pennsylvania State University.

4.      As a Special Agent with the DEA, I have participated in numerous drug investigations resulting in the criminal charges, arrests, seizures of narcotics, seizure of assets and subsequent convictions for narcotic violations.  Through such training and experience, I have developed a working knowledge and understanding with the ways illicit drugs including heroin, fentanyl, cocaine, and other controlled substances, are packaged, priced, and distributed. Furthermore, I am familiar with the paraphernalia associated with certain drugs and the street terminology used in their classification.

5.      I have received training regarding narcotics investigations, drug identifications, confidential source handling, and surveillance techniques while attending the Basic Agent Training Academy.

6.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. During federal investigations, I have also reviewed recorded conversations and telephone, financial, and drug records.

7.      Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, heroin, fentanyl, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged

2

on the street for these substances, the method of packaging, and the jargon used in their trade.  I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

8.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.  Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."  I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

## Purpose of the Affidavit

9.      I submit this affidavit in support of an application for a criminal complaint alleging that on October 2, 2019, Isaiah RIEVES a/k/a "Unk" ("RIEVES" or "Target Subject") distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vi).

10.     I also submit this affidavit in support of an application for a search warrant for the following target location, which is described in greater detail below and in Attachment A and B, and which is believed to be the residence of RIEVES:

3

a.  75 Seymour Avenue, Lynn, Massachusetts ("Target Location").

11.     Based on the facts set forth in this affidavit, there is probable cause to believe that RIEVES has violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) (distribution of 40 grams or more of fentanyl and other controlled substances) (the "Target Offense") and that evidence of the Target Offense, as set forth in Attachment B, will be found inside the Target Location.

12.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

## **Probable Cause**

### A.  Target Offense

13.     The DEA New Bedford Resident Office has been engaged in an investigation into the drug distribution activities of RIEVES since October 2019.

14.     In August 2019, investigators conducted two controlled purchases of controlled substances (lab-confirmed fentanyl pills on the first occasion, and then suspected fentanyl pills, heroin/fentanyl powder, and cocaine on the second occasion) from an individual who later began cooperating with investigators ("CS").

15.     On September 19, 2019, this Court authorized a search warrant for CS's residence. On October 1, 2019, investigators executed that search warrant and located approximately 2,447 grams of suspected fentanyl, 716 grams of suspected benzodiazepine pills, 176 grams of suspected gabapentin, 623 grams of suspected cocaine, 469 grams of suspected Adderall pills, 269 grams of suspected ecstasy, 291 grams of suspected methamphetamine, 70 grams of Suboxone Strips, 33

4

grams of suspected acid, 66 grams of suspected fentanyl pills, and 971 grams of miscellaneous cutting agents.  All of these substances have been sent to the DEA Northeast Regional Laboratory for analysis, and the results are pending.

16.    CS immediately agreed to cooperate and—after waiving his/her Miranda rights— admitted that the drugs found in his/her apartment belonged to him/her.  He/she provided information about the individual from whom he/she purchased the drugs.  CS stated that CS originally met his/her supplier, a black male, known as "Unk/Unc," approximately one and a half years ago.  CS stated that "Unk" lives in Lynn, Massachusetts and drives a gold Chevy Tahoe (the "RIEVES Tahoe"), as well as a motorcycle.  CS stated that he/she communicated with "Unk" via text message, and typically bought heroin, Percocet, benzodiazepine, ecstasy, gabapentin, cocaine, and/or Adderall from "Unk."  CS also stated that "Unk" typically "fronts" CS the drugs, and then CS pays "Unk" back at a later date.  CS provided the telephone number for "Unk" as 208-781-8233 ("RIEVES Phone").  As detailed below, investigators later identified the person CS knew as "Unk" to be RIEVES.

17.    On October 2, 2019, at the direction and under the supervision of investigators, CS contacted RIEVES via the RIEVES Phone and stated that CS needed to re-up and wanted to know if RIEVES was available that same day. RIEVES told CS he was available "around 7ish" and would let CS know when he was in the area.  CS and RIEVES agreed on a meeting location familiar to CS.  Investigators searched CS and CS's vehicle with negative results, and provided CS with an audio transmitting and recording device.  At approximately 7:45 p.m., CS received a text message from REIVES Phone stating that he was en route to meet the CS.

USAO-000022

18.     At approximately 9:26 p.m., investigators observed the RIEVES Tahoe, which was being driven by a black male later determined to be RIEVES, arrive and park near the prearranged meeting location.   RIEVES was alone in the RIEVES Tahoe.   At approximately 9:29 p.m., CS received a text message from RIEVES Phone stating that he had arrived.   CS entered his/her own vehicle and traveled to meet RIEVES, while being followed by investigators.   At approximately 9:38 p.m., CS parked his/her own vehicle near the RIEVES Tahoe, exited his/her own vehicle, and entered the front passenger seat of the RIEVES Tahoe. While CS was inside the RIEVES Tahoe, RIEVES advised CS to get a new telephone, and told CS that he had a new telephone number: 339-440-2390 ("RIEVES Phone 2").

19.     At approximately 9:53 p.m., CS exited the RIEVES Tahoe and retrieved a box from the back of the RIEVES Tahoe, which CS carried to his/her own vehicle.   CS then drove his/her vehicle—while under surveillance—directly to meet with investigators.   Inside the box CS received from RIEVES, investigators located numerous types of pills and other powder/rock substances, all believed to be controlled substances, including: an orange prescription-type bottle containing red rectangular pills believed, based on their color, shape, and size, to be ecstasy pills; a clear knotted bag containing a white rock-like substance believed, based on its color and appearance, to be cocaine; a clear plastic bag containing orange pills with "30" and "AD" imprinted on them believed, based on their color, shape, and size, to be Adderall; a sealed vacuum bag containing a white rock-like substance believed, based on its color and appearance, to be cocaine; a clear bag with "500" written on the outside of the bag, containing blue pills with "K9" imprinted believed, based on their color, shape, and size, to be fentanyl pills; a sealed vacuum bag containing a tan rock-like substance believed, based on its color and appearance, to be fentanyl; 5

USAO-000023

separate black boxes marked "Liquid Gold Pods," further containing 10 smaller boxes, believed, based on the markings on the box, to be THC pods. All of these substances were sent to the DEA Northeast Regional Laboratory for analysis. The results for the blue pills marked K9 came back positive for 61.18 grams of fentanyl, and the results for the tan rock like substance came back positive for 247.3 grams of fentanyl. The remaining results are pending.

20.     Meanwhile, other investigators followed the RIEVES Tahoe as it traveled back up to Lynn, Massachusetts. At approximately 10:39 p.m., state investigators executed a traffic stop of the RIEVES Tahoe and the driver presented a Massachusetts driver's license in the name of Isaiah RIEVES, with an address of the Target Location (75 Seymour Avenue, Lynn, Massachusetts). Following the traffic stop, investigators continued surveillance of the RIEVES Tahoe as it traveled to the Target Location, where RIEVES exited the RIEVES Tahoe and walked toward the Target Location.

21.     On October 22, 2019, RIEVES contacted CS via RIEVES Phone 2 requesting payment for the controlled substances delivered on October 2, 2019. Under the direction and supervision of investigators, CS told RIEVES he could provide partial payment, but did not have the full payment. On the evening of October 22, 2019, GPS data revealed that RIEVES traveled from Lynn, Massachusetts to the CS's home, and then to his/her parents' home. Investigators conducting surveillance outside of CS's parents' home observed RIEVES drive the RIEVES Tahoe past the home several times before parking outside and shutting off the headlights. RIEVES then attempted to contact CS several times, before RIEVES left the area and traveled back to the Target Location. Later that night, RIEVES contacted CS and told him/her that he was going to come back on the evening of October 23, 2019, to collect payment.

7

22.     Based on the foregoing, there is probable cause to believe RIEVES distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vi).

B.  <u>Target Location</u>

*Drug Traffickers' Use of Residences and Stash Houses Generally*

23.     Based on my training and experience, including participation in other narcotics investigations and extensive discussions with other law enforcement officials experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences and/or "stash" or "staging" locations ("storage locations"). I have participated in the execution of numerous search warrants of the residences and/or storage locations of drug traffickers whose criminal activity is similar to that of the Target Subject. In a substantial number of these searches executed in connection with the drugs investigations in which I have been involved, drug related evidence has typically been recovered, including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

    i.      Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residences or storage locations in order to maintain and finance their ongoing business;

    ii.     Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation,

8

ordering, sale and distribution of controlled substances, and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other storage locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or storage locations for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

iii.   It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

iv.   It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

v.   Drug traffickers commonly maintain electronic and paper book or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where

9

the traffickers have ready access to them, commonly on the traffickers' cell phone(s).  They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

vi.     Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

vii.    Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

viii.   Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

ix.     Drug traffickers frequently possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs;

x.      Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

24.     Based on all of the evidence I have obtained in the course of this investigation, and

for the reasons more specifically set forth herein, I believe the Target Subject, like many drug

traffickers, uses his residences in furtherance of his ongoing drug-trafficking activities, and that,

among other things, documentary and other evidence regarding those activities, including, but not

limited to, the items set forth in Attachment B, will be found in the Target Location.  *See e.g.,*

*United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction.  182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even

10

*Description and Criminal Activity at Target Location*

25.     The residence at 75 Seymour Avenue, Lynn, Massachusetts (the Target Location) is a two-story, single-family house.  The house and its yard are enclosed by a fence. The front door is accessed via several stairs.  The number "75" is printed in dark lettering on the top stair before the front door.

26.     As set forth above, in paragraph 20, RIEVES' driver's license lists his residence as the Target Location, and investigators observed RIEVES return to the Target Location after delivering the box of fentanyl and other controlled substances to CS on October 2, 2019.

27.     Further, on October 8, 2019, the Court authorized investigators to use a real-time Global Positioning System ("GPS") on the RIEVES Tahoe (19-MJ-6450-MPK).  Investigators installed the GPS device on October 10, 2019.  GPS data from this device reveals that the RIEVES Tahoe has been parked outside of the Target Location every night since the GPS device was installed, including as recently as October 22, 2019. Additionally, in that same time period, investigators have physically observed RIEVES driving the RIEVES Tahoe to/from the Target Location, and have seen RIEVES entering the Target Location.  Based on the above, I believe the Target Location is RIEVES' residence.

28.     Based on my training and experience, and the information set out above, I believe the Target Subject, like many drug traffickers, uses his residence at the Target Location in furtherance of his ongoing drug-trafficking activities, and that, among other things, drug proceeds,

---

longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)).  As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

USAO-000028

ledgers detailing drug transactions and drug debts, customers lists, telephones used to conduct drug transactions, and other evidence of ongoing drug trafficking activities, as set forth in Attachment B, are likely to be stored at the Target Location.

*Basis for Seizure and Search of Cellular Telephones*

29.     In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular telephones at the same time, as well as prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.   Indeed, throughout this investigation, the Target Subject has used cellular telephones to communicate about and further his drug trafficking activities and has changed his telephone numbers.

30.     This request to seize and search cellular telephones includes "smartphones," i.e. those cellular telephones that are capable of serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.   Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

31.     A cellular telephone is a handheld wireless device used for voice and text communications, as well as for accessing the internet.   Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which

12

records the telephone number, date, and time of calls and text messages made to and from the phone.   In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities, including but not limited to, storing names and phone number in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include GPS technology for determining the location of the device.   Based on my training and experience, I know that many cellular telephones have capabilities described above.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.   I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in order to further prevent detection, and often use text messages in lieu of telephone calls to avoid speaking over the telephone.

32.   Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files stored on cellular telephones (and particularly smartphones) can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

i.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.   Furthermore, when users replace their cellular telephones, they can easily transfer the data from their old cellular telephone to their new cellular telephone;

ii.   Even after files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might

13

not occur for long periods of time.  In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

iii.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

33.   Based on my knowledge and training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a cellular telephone, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the cellular telephone be seized and processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because:

i.   Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site; and

ii.   Analyzing cellular telephones is a highly technical process requiring expertise and a properly-controlled environment.  It is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Consequently, law enforcement agents may either copy the data at the premises to be searched, or seize the computer equipment for subsequent processing elsewhere.  This application seeks permission to search and seize cellular telephones either onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## CONCLUSION

34.   Based on the information set forth above, I believe probable cause exists to conclude that on October 2, 2019, the Target Subject distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and

14

19-MJ-6518-MPK
19-MJ-6519-MPK

(b)(1)(B)(vi), and further, that evidence of the Target Offense, as set forth in Attachment B, will

be found inside the Target Location.

I declare that the foregoing is true and correct.

_____
Melissa Gillen
Drug Enforcement Administration

Subscribed and sworn to before me on October _____23_____, 2019

_____
Hon. M. Page Kelley
United States Magistrate Judge

15

## ATTACHMENT A

The residence at 75 Seymour Avenue, Lynn, Massachusetts (the Target Location) is a two-story, single-family house.   The house and its yard are enclosed by a fence. The front door is accessed via several exterior stairs.   The number "75" is printed in dark lettering on the top stair before the front door.   Photographs of the Target Location are included below.





16

USAO-000033

## ATTACHMENT B

### (Items to be seized from property)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of fentanyl and other controlled substances) and 846 (drug conspiracy) (the "Target Offense"):

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

17

USAO-000034

7.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.    Cellular telephones used by or belonging to Isaiah RIEVES, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

    a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

    b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c.    Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    d.    Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    e.    GPS data;

    f.    Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    g.    Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

    i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

USAO-000035